IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02794-MEH

MARK RONALD TROE,

     Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

     Plaintiff Mark Ronald Troe appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability and disability insurance benefits ("DIB"), originally filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court affirms in part and reverses in part the ALJ's decision, and remands the matter to the Commissioner for further consideration.[1]

---

[1]The parties consented to this Court's jurisdiction on January 27, 2017. ECF No. 13.

## BACKGROUND

### I.     Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying his application for

DIB filed on August 9, 2013.  [Administrative Record ("AR") 164-165]  After the application was

denied on March 13, 2014 [AR 103-109], an Administrative Law Judge ("ALJ") scheduled a hearing

upon the Plaintiff's request for April 17, 2015 [AR 125-151], at which Plaintiff was represented by

counsel, and the Plaintiff and a vocational expert testified.  [AR 38-73]  The ALJ issued a written

ruling on July 14, 2015 finding Plaintiff was not disabled starting on March 1, 2011 through June

30, 2014 because considering Plaintiff's age, experience, and residual functional capacity, he could

successfully adjust to other work existing in significant numbers in the national economy.  [AR 20-

32]  On September 13, 2016, the SSA Appeals Council denied Plaintiff's administrative request for

review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of

judicial review [AR 1-6].  *See* 20 C.F.R. § 404.981.  Plaintiff timely filed his complaint with this

Court seeking review of the Commissioner's final decision.

### II.    Plaintiff's Alleged Conditions

Plaintiff was born on September 30, 1965; he was 47 years old when he filed his application

for DIB on August 9, 2013.  [AR 164]  Plaintiff claims he became disabled on January 1, 2010 [AR

183] and reported that he was limited in his ability to work due to "occular migraines, degenerative

disc disease, back injury, 'ADD,' sciatica, and migraines."  [AR 206]  Plaintiff completed a

"Function Report" in tandem with his application, in which he explained that he was "unable to

complete job tasks and be a reliable employee" because he "would miss many days of work due to

[his] condition" and he was "not able to determine when [his] condition will limit [him] or act up." [AR 223]  He also stated that he had difficulty sleeping due to pain; he could prepare easy meals, do laundry and dishes, shop for groceries, and drive; physical and mental activity were difficult due to pain; and ocular migraines made seeing difficult at times.  [AR 224-230]

The record dates back to 2011, at which time Plaintiff was treated by Usama Ghazi, M.D. for lumbar back pain.  Plaintiff had reported a back injury at work from an incident in July 2005 when he was carrying a spool of wire with a partner, and the partner dropped the spool.  [AR 290] An MRI taken on June, 27 2011 revealed "an L4-5 disk protrusion which measure[d] 7 mm; . . . at L5-S1, however, there is a 7mm right lateral disk osteophyte complex encroaching the right foramin, contacting the S1 nerve root." [AR 335]  During 2011-2012, Dr. Ghazi performed rhizotomies on the Plaintiff's spine, prescribed him pain medication, and ordered physical therapy.

On February 28, 2013, Plaintiff presented to the emergency department at Longmont United Hospital complaining of high blood pressure and increasing fatigue, lethargy, and exertional dyspnea. [AR 366] The attending physician, Andrew Johanos, M.D., found no renal insufficiency, brain bleed, or abnormal EKG, and encouraged Plaintiff to be admitted "for control of his blood pressure," but Plaintiff refused. [AR 368] Thereafter, Plaintiff began treating with Murry Drescher, M.D. for his "benign" hypertension and with Matthew Brett, M.D. as his "primary care provider" (PCP).  On May 17, 2013,  Plaintiff reported to Dr. Brett that he had "been on [Adderall] for 25 years" to treat his Attention Deficit Disorder (ADD) and dyslexia, and asked for a prescription, which Dr. Brett granted.  [AR 490-491]  Plaintiff also reported his pain was under "good control" with the medication, Avinza. [AR 479, 482, 485] However, on October 21, 2013, Plaintiff

complained of increased back pain to Dr. Brett and requested "another rhizotomy," but the doctor "adjusted" his Percocet dosage and refilled his Avinza. [AR 529-530] Plaintiff reported the same pain complaints the following November, December, and January. [AR 544-554]

On March 10, 2014, Plaintiff presented to John Mars, M.D. for a physical consultative examination. Plaintiff reported he developed migraines in 2007 after a head trauma; he was diagnosed by a "specialist" with ocular migraines, which he experienced twice a month for one-to-two days each time; he avoided television and computer screens, which seemed to trigger the migraines; he injured his back in 2005 when he lifted a large spool of wire while working as an electrician; he was treated for back pain with medication, physical therapy, and four-to-five rhizotomies; he was diagnosed with ADD as a child and graduated from high school; and, he was able to dress, bathe, drive, cook simple meals, shop for groceries, and perform limited household chores. [AR 555-556] After a thorough physical examination, Dr. Mars diagnosed Plaintiff with a history of migraine headache, low back pain, ADD, and obesity, and found Plaintiff should avoid ladders and scaffolds due to medications, but he could stand, walk, climb stairs, and sit without limitations; could handle objects and use his feet for foot controls; could kneel, stoop, crawl and crouch on occasion; and could lift and carry twenty pounds. [AR 558] An x-ray of the Plaintiff's lumbar spine that same day revealed "degenerative disc disease at T11-T12 and L4-L5." [AR 568]

In the spring 2014, Dr. Brett expressed his concerns to Plaintiff regarding his weight, blood sugar levels, and the amount of pain medication Plaintiff was taking; Dr. Brett encouraged diet and exercise and adjusted Plaintiff's medication. [AR 600-613] By September 2014, Plaintiff was only on dilaudid for pain and "doing well" [AR 590]; however, in October 2014, Plaintiff had an

"episode" of severe back pain, and Dr. Brett placed Plaintiff on his original medication regimen. [AR 589] In 2015, Plaintiff complained of a head injury and increased headaches [AR 688], but a CT scan of his brain revealed "no evidence of acute intracranial abnormality." [AR 691]

In March 2015, Dr. Brett referred Plaintiff to the Salud Family Health Center for treatment of Plaintiff's depression. [AR 700] Alfonso Cappa assessed Plaintiff with "bipolar NOS" and suggested a prescription of "mood stabilizers." [AR 695-696] Dr. Brett prescribed Depakote starting on March 30, 2015. [AR 694]

On April 2, 2015, a Medical Consultant for the SSA, K. Terry, completed a physical residual functional capacity assessment for Plaintiff finding that Plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; sit, stand, and/or walk for six hours of an eight-hour workday; had no postural, manipulative, visual, or communicative limitations; and was to avoid concentrated exposure to extreme cold, noise, and machine hazards. [AR 668-675]

Plaintiff presented to Stuart L. Kutz, Ph.D. on May 6, 2015 for a psychological consultative examination at the ALJ's request following the hearing in this case. [AR 702-710] Concerning his mental health, Plaintiff reported that he was assessed with ADHD as a child, first prescribed psychoactive medication in the 1980s for depression, never had any inpatient mental health treatment, and his symptoms became worse over time since his 2005 back injury. Plaintiff stated that he had no friends, his ex-wife helped him with cleaning, he had "become a recluse," he lived in a home owned by his parents, he last worked full-time in 2005 and performed some work as an electrician for a short period in 2011 or 2012. Dr. Kutz diagnosed Plaintiff with mood disorder NOS

and anxiety disorder NOS, and assessed a Global Assessment of Functioning (GAF) score of 60.[2]

---

[2]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:

The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":

• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."

• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."

• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."

• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."

• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."

• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."

• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent

### III. Hearing Testimony

At a hearing on April 17, 2015, Plaintiff (who appeared with counsel) and a vocational expert, William Tisdale, testified. [AR 38-73] During opening remarks, Plaintiff's counsel expressed Plaintiff's desire to amend the disability onset date from January 1, 2010 to March 1, 2011. [AR 40] Plaintiff testified that he had pain all day long in his lower back that radiated down his right leg and into his foot; he could lift ten pounds, sit for an hour, stand for forty-five minutes to an hour, and walk thirty to forty-five minutes; he never left his home without his cane; the medication prescribed for his diabetes made him feel unwell; he did not know whether his diabetes affected his ability to work; he was suffering migraines once a week that lasted a day, and occular migraines every other day that lasted an hour; he slipped and fell during a recent ice storm, which caused ringing in his ears and cognitive issues; the medications he took for back pain, diabetes, high blood pressure, migraines, ADD, and depression caused him to feel drowsy and sleep during the day; he lived in a mobile home owned by his parents; his ex-wife cleaned the home once a month, but he did his own laundry and shopped for groceries; he drove "a little bit"; his ADD caused him to become distracted and unable to finish projects; he became "short-tempered" and blunt with people; he had no friends, but socialized some with family; he became anxious and claustrophobic in restaurants, but not in the grocery store; he was able to stay focused for hours and, sometimes, days; television and computer screens aggravated his migraines, so he listened to the radio; he lost

---

inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."

• 0: "Inadequate information."

7

his friends due to pain; bending is the primary cause of his back pain/spasms; to alleviate the pain, he would lie down in a "Joe Namath pose"; he also positioned his clothes dryer up and ate off of paper plates, so he would not have to bend to fold clothes or load a dishwasher; he could sleep only two hours at a time before the pain awakened him; and, the combination of the pain, medications, and lack of sleep made him feel unwell all of the time. [AR 41-62]

The ALJ then turned to the vocational expert, Mr. Tisdale, who testified that an individual with Plaintiff's age, experience and education and the following limitations— occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; sit, stand and walk six hours in an eight-hour workday; avoid concentrated exposure to extreme cold, noise, fumes, odors, dusts, gasses, unprotected heights, and moving machinery— could not perform the Plaintiff's past jobs but could perform the jobs of "routing clerk," "mail clerk," and "cashier"; if the limitations were further restricted to the use of a case for ambulation, the routing clerk and mail clerk would be eliminated and the cashier would be eroded by one half. [AR 66-67] At the sedentary level, such individual could perform the jobs of "document specialist" and "addressing clerk." If the individual were limited further to avoiding crawling, ladders, scaffolds and only occasionally stoop, kneel, and crouch, he would be able to perform any of the listed jobs. [AR 67-68] If such individual were required to nap twice a day or to be absent three days per month on a consistent basis, there would be no work available.

The ALJ issued an unfavorable decision on July 15, 2015. [AR 17-33]

## LEGAL STANDARDS

To qualify for benefits under sections 216(i) and 223 of the SSA, an individual must meet

the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(i), 423, 1382.

## I.    SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. § 404.1520.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c).  If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  *Id.*  Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. § 404.1520(d).  If the impairment is not listed, he is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work that he has performed in the past.  If the claimant is able to perform his previous work, the claimant

is not disabled.  *See* 20 C.F.R. § 404.1520(e), (f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education, and work experience.  *See* 20 C.F.R. § 404.1520(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted).  In addition, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *Id.* (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).  But, in all cases, the Court may not re-weigh the evidence nor substitute its

judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

## ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the onset date of his disability, March 1, 2011 (Step One). [AR 23] Further, the ALJ determined that Plaintiff had the following severe impairments: obesity, degenerative disc disease/spondylosis of the lumbar spine with radiculopathy, migraines, varicose veins, and diabetes mellitus (Step Two). [*Id.*] He found Plaintiff's other medically determinable impairments, including chronic pain syndrome, ADD/ADHD, hypertension, and/or a head injury were not "severe." [AR 24-25] Next, the ALJ found the Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 25]

The ALJ then determined that Plaintiff had the RFC "to perform light work as defined in 20 CFR 404.1567(b) with the following restrictions: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; avoid ladders and scaffolds; occasionally stoop, kneel, and crouch; no crawling; and avoid concentrated exposure to extreme cold, noise, fumes/odors/dust/gases, and hazards such as unprotected heights and moving machinery." [AR 25]

The ALJ also found that, considering the Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was unable to perform his past relevant work (Step Four); however, there were jobs in the national economy that Plaintiff could perform, such as "cashier,"

"routing clerk," and "mail clerk." [AR 31-32] As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA. [AR 32]

Plaintiff sought review of the ALJ's decision by the Appeals Council on August 12, 2015. [AR 15] On September 13, 2016, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security." [AR 1-6] Plaintiff timely filed his Complaint in this matter on November 16, 2016.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) whether the ALJ erred in finding Plaintiff's impairment of attention deficit disorder non-severe; and (2) whether the ALJ erred in finding Plaintiff could perform light work by failing to properly weigh the medical opinion evidence.

## ANALYSIS

The Court will address each of the Plaintiff's issues in turn.

## I.      Whether the ALJ Erred at Step Two

Plaintiff argues that he established the existence of a severe attention deficit disorder (ADD) as found by Dr. Kutz, the consultative examining physician, but the ALJ found the ADD not to be severe and, thus, he improperly afforded the impairment no further analysis and included in the RFC no mental limitations. Opening Br., ECF No. 15 at 9-10.

Pursuant to 20 C.F.R. § 404.1520(a)(4)(ii), at the second step of the sequential evaluation process, an ALJ is required to determine whether an impairment is medically determinable, whether

the impairment may be classified as severe, and whether such impairment meets the duration requirement of 42 U.S.C. § 423(d)(1)(A), which provides:

(1) The term "disability" means--

(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

"A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508. Section 404.1508 provides that a claimant's "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." More specifically, "symptoms" are the claimant's description of his/her own physical or mental impairments; "signs" are anatomical, physiological, or psychological abnormalities that can be observed apart from symptom descriptions and must be shown by medically acceptable clinical diagnostic techniques; and "laboratory findings" are anatomical, physiological or psychological phenomena that can be shown by use of medically acceptable laboratory diagnostic techniques. 20 C.F.R. § 404.1528.

An ALJ's omission of an impairment altogether could be reversible error. "It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less. ... Further, the failure to consider all of the impairments is reversible error." *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006) (citations omitted); *see also Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (citing

20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

Here, the ALJ did not omit consideration of Plaintiff's ADD/ADHD altogether; rather, he found that a medical record nearly devoid of mental health records prior to the date last insured, Plaintiff's "good response to medications for ADD/ADHD," and the May 15, 2015 report by Dr. Kutz demonstrated Plaintiff's mental health was "largely normal." [AR 24] This finding indicates that the ALJ recognized Plaintiff's ADD/ADHD as a medically determinable impairment.

Plaintiff argues that the ALJ erred by failing to find the ADD/ADHD "severe" and ignored Dr. Kutz's actual "opin[ion] that Mr. Troe's attention, concentration, persistence, pace, task completion, and social adaptation would be mildly to moderately impaired" . . . which "suggests that Mr. Troe's attention deficit disorder would have more than a minimal impact on his concentration, persistence, pace, and social functioning in the workplace." Op. Brief 9-10. However, "the failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is severe." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016). In this case, the ALJ found five severe impairments and proceeded with the analysis as required. *Id.* ("As long as the ALJ finds one severe impairment, the ALJ may not deny benefits at step two but must proceed to the next step."). Therefore, the ALJ did not err at Step Two by failing to find Plaintiff's ADD/ADHD was "severe."[3]

---

[3]In determining the Plaintiff's ADD/ADHD was not severe, the ALJ noted Dr. Kutz's Medical Source Statement of Ability to Do Work-Related Activities (Mental) [AR 708-709] saying, "the form setting forth those [mild and moderate] limitations defines 'moderate' as more

However, Plaintiff also argues the ALJ failed to "include any mental limitations" in his RFC assessment. Op. Brief 10. The Court construes this argument as articulating a failure on the part of the ALJ to consider all medically determinable impairments, whether severe or not, in formulating the RFC. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (". . . in assessing the claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, *whether severe or not severe*.") (citing 20 C.F.R. §404.1545(a)(2)) (emphasis in original). Remand is appropriate where it appears from the ALJ's ruling that he or she excluded non-severe medically determinable impairments from consideration as part of his or her RFC assessment. *Id.*

The record indicates here that Plaintiff had been treated for ADD/ADHD since at least September 2012 when the worker's compensation physician, Dr. Ghazi, noted that Plaintiff "does take Adderall intermittently from his primary care physician." [AR 323] In May 2013, Plaintiff initiated care by Dr. Brett and asked to be "re-started on Adderall." [AR 496] Dr. Brett diagnosed Plaintiff with ADHD and, after clearing the medication with Plaintiff's cardiologist, he prescribed Adderall for Plaintiff's ADHD starting on May 17, 2013. [AR 491] The record indicates Dr. Brett continued this diagnosis and prescription through March 2, 2015. [AR 688-689]

Moreover, while Dr. Kutz found no "psychosis" or "mania" in May 2015, he agreed with Plaintiff's diagnosis of ADHD (Attention Deficit Hyperactivity Disorder), mood disorder NOS, mild

than a slight limitation in the particular area, but the individual is still ab[l]e to function satisfactorily, which does not suggest any significant mental limitation. Moreover, the issuance of the opinion and the exam on which it was based occurred nearly a year after the claimant's date last insured of June 30, 2014, giving it limited relevance for the period on and prior to that date." [AR 24]

to moderate, and anxiety disorder NOS, mild. [AR 707] Dr. Kutz assigned Plaintiff a GAF score of 60, which indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." [*Id.*; *see also Keyes-Zachary*, 695 F.3d at 1162 n.1.] On a SSA Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Kutz noted that Plaintiff was mildly limited in the ability to make judgments on simple work-related decisions, to understand and remember complex instructions, and to carry out complex instructions; mildly to moderately limited in the ability to make judgments on complex work-related decisions, to interact with supervisors and co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting; and, moderately limited in the ability to interact appropriately with the public. [AR 708-709]

Plaintiff also testified that "[t]he ADD just distracts, distracts me. I don't finish tasks. I start stuff and can't seem to get them done. Medicine seems to help a little. . . . I was an electrician most of my life so I'd have like a normal routine, how I do stuff, but then I'd see something out of the corner of my eye and stop what I was doing to go do something else and then forget about . . . the task I originally had because I saw something out of the corner of my eye." [AR 50]

Despite this record, the ALJ mentioned no mental impairments, including ADD/ADHD, in his analysis subsequent to Step Two. Without mention of Plaintiff's ADHD at later steps in the decision, the Court cannot discern whether the ALJ considered them singly and/or in combination with the other impairments to determine whether Plaintiff was disabled during the relevant time period. *See Walker v. Colvin*, No. 12-cv-235-EJF, 2014 WL 794261, at *7-*8, *12 (D. Utah. Feb.

27, 2014) (remanding matter for ALJ's failure to determine the plaintiff's migraines were medically determinable at step 2 and failure to consider them in subsequent steps). The RFC itself appears to include limitations only for the Plaintiff's physical impairments [AR 25]; but, without any indication from the ALJ as to whether he considered Plaintiff's ADHD, the Court cannot determine whether the RFC takes such impairment into account. Therefore, the Court must conclude such omission is reversible error under prevailing law. *See Wells*, 727 F.3d at 1069 ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

Because there is no indication the ALJ considered the Plaintiff's ADHD at stages of his analysis subsequent to Step 2, particularly in formulating the RFC and determining whether the Plaintiff could perform the jobs of "routing clerk," "mail clerk," and "cashier" (including seeking testimony from the experts), the Court will reverse the ALJ's decision on this issue and remand to the Commissioner for further consideration. *See Sissom v. Colvin*, 512 F. App'x 762, 769 (10th Cir. 2013) (citing *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) and *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004)) (cautioning the ALJ on remand to "make adequate findings" to assure that the correct legal standards are invoked and to ensure a meaningful appellate review).

## II.    Whether the ALJ Properly Weighed the Opinion Evidence

Plaintiff first asserts that the ALJ erred in failing to consider Peter de Jong, a physical therapist, as a treating physician. The Court disagrees.

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical

professional." *Hamlin*, 365 F.3d at 1215 (citing 20 C.F.R. § 401.1527(d)).  The ALJ must "give

consideration to all the medical opinions in the record" and "discuss the weight he assigns to them."

*Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (internal quotation marks omitted).  The

applicable regulations governing the SSA's consideration of medical opinions distinguish among

"treating" physicians, "examining" physicians, and "nonexamining" (or "consulting") physicians.

*See* 20 C.F.R. § 416.927(c).

According to the "treating physician rule," the Commissioner will generally "give more

weight to medical opinions from treating sources than those from non-treating sources."  *Langley

v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2).  In fact, "[a]

treating physician's opinion must be given substantial weight unless good cause is shown to

disregard it."  *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir.

1995).  A treating physician's opinion is accorded this weight because of the unique perspective the

doctor has to medical evidence that cannot be obtained from an objective medical finding alone or

from reports of individual examinations.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir.

2004).

When assessing how much weight to give a treating source opinion, the ALJ must complete

a two-step inquiry, each step of which is analytically distinct.  *Krauser v. Astrue*, 638 F.3d 1324,

1330 (10th Cir. 2011).  The ALJ must first determine whether the opinion is conclusive – that is,

whether it is to be accorded "controlling weight" on the matter to which it relates.  *Watkins v.

Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330.  If the opinion

is not supported by medically acceptable evidence, then the inquiry at this stage is complete.

*Watkins*, 350 F.3d at 1300. However, if the ALJ "finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record ." *Id.* If not, the opinion is not entitled to controlling weight. *Id.* In contrast, if the medical opinion of a treating physician is well supported by medically acceptable evidence and is not inconsistent with the other substantial evidence in the record, an ALJ must give it controlling weight. *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10 (D. Colo. Feb. 24, 2014) (citing 20 C.F.R. § 416.927(c)(2)).

Here, Plaintiff contends the ALJ should have considered Mr. de Jong as a treating physician. However, Plaintiff cites no binding case law, and the Court has found none, finding that a non-physician can be considered a "treating source" under the treating physician rule. Thus, the Court finds the ALJ did not err in this regard.

Plaintiff also argues that the ALJ "should have adopted" Mr. de Jong's opinion, because Mr. de Jong is a "specialist" in his field, the testing he performed on the Plaintiff was "typical" for determining a patient's functional abilities, and the opinion is consistent with the medical evidence. Op. Brief, 12.

If the opinion of a treating physician does not merit controlling weight or if there is no opinion by a treating physician, the ALJ must move to step two and consider the following factors in determining how to evaluate other medical opinions in the record: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations. *Id.* "An ALJ may dismiss or discount an opinion from a medical source only if his decision to do so is

'based on an evaluation of all of the factors set out in the cited regulations' and if he provides 'specific, legitimate reasons' for [the] rejection." *Id.* (quoting *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012)).

It is error for an ALJ not to adequately state and explain what weight he gives to medical opinions. *See Langley*, 373 F.3d at 1119. The ALJ must give "good reasons" for the weight he ultimately assigns each medical opinion. *Watkins*, 350 F.3d at 1301. The ALJ's decision must be sufficiently specific to make clear to any subsequent reviewer the weight given to the medical opinion, and the reason for that weight. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Even though an ALJ is not required to discuss every piece of evidence, it must be clear that the ALJ considered all of the evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. Boilerplate language, unconnected to any evidence in the record, will not suffice to support an ALJ's conclusion. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). An ALJ may reasonably give less weight to a medical opinion that differs from that same doctor's notes. *See Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013).

Here, the ALJ stated the following concerning Mr. de Jong's evaluation:

Based on a September 2011 functional capacity evaluation, the claimant was recommended for light work activities with no frequent lifting, carrying, pushing, or pulling, performance of upper extremity tasks with an equal work/rest ratio, sitting for "less than the usual requirement" of six hours in an eight-hour workday, changes in posture every 45 minutes, and no climbing (Id. at 16; see ex. 1 F). However, the limitations were based, in part, on the claimant's self-report (*see* ex. 3F at 17). Later that month, his treating physician, Usama Ghazi, D.O, gave the claimant work

restrictions of lifting up to 20 pounds, frequently lifting 10 pounds, bending, stooping, and climbing for one hour a day each, and no crawling (*Id.*). At a November 2011 physical therapy intake evaluation, the claimant described having pain at level "3" or "4" out of 10 and being able to sit for one hour at a time, stand for two hours at a time, and walk three-quarters of a mile at a time (ex. 2F at 3), which indicates greater capacity than did his self-reports that resulted in the functional capacity evaluation recommendations.

\*\*\*

The undersigned finds much less persuasive the recommendation, based on a September 2011 functional capacity evaluation, that the claimant be limited to light work activities with no frequent lifting, carrying, pushing, or pulling, performance of upper extremity tasks with an equal work/rest ratio, sitting for "less than the usual requirement" of six hours in an eight-hour workday, changes in posture every 45 minutes, and no climbing ([*s*]*ee* ex. 3F at 16; see ex. 1 F). The undersigned accords this recommendation little weight because it is not from an "acceptable medical source" (*see* 20 CFR 404.1513(a)), it was based, in part, on the claimant's own self-report (*see* ex. 3F at 17), it was inconsistent with his report just a couple of months later of having greater capacity than he described at the functional capacity evaluation (*see* ex. 2F at 3), it is inconsistent with the work restrictions issued by his treating physician, Dr. Ghazi, after his review of the functional capacity evaluation report (*see* ex. 3F at 17), and it is inconsistent with the persuasive opinions of an examining physician, Dr. Mars (*see* ex. 8F), and a Social Security medical consultant ([*s*]*ee* ex. 14F).

[AR 27, 29-30]  The Court finds that the ALJ's findings concerning Mr. de Jong's opinion to be thorough and supported by the applicable law.  Plaintiff's unsupported contention that "Mr. de Jong's opinion was the only opinion that was not inconsistent with the medical records" is not persuasive; Plaintiff provides an example that, "[a]s recently as December 2013, [Plaintiff's] treating physician recommended surgery to treat [Plaintiff's] degenerative disc disease. R. 548." Reply 4. However, the record dated December 18, 2013 and authored by Dr. Brett actually states, "p[atien]t is needing referral to get repeat evaluation from back surgeon and can't afford it. Will get into physical therapy to see if helpful." [AR 548] Other than this reference to an evaluation by a "back

surgeon," there is no mention of "surgery" in this record nor that Dr. Brett "recommended surgery to treat" the Plaintiff. *Id.*

Finally, the Plaintiff argues that the ALJ erred by according more weight to the opinions of the consulting and reviewing physicians than to the treating physician's opinion concerning Plaintiff's postural limitations (stoop, kneel, crouch, and crawl).

The ALJ found the following regarding the three physicians' opinions:

> Several opinions of the claimant's functioning have been issued in this case. Based on the March 2014 consultative exam, the examining physician, John Mars, M.D. opined that the claimant could lift and carry up to 20 pounds, should avoid ladders and scaffolds, and could occasionally stoop, kneel, crouch, and crawl, but otherwise had no significant physical limitations (See ex. 8F at 4). Subsequently, a Social Security medical consultant similarly opined that during the period through his date last insured of June 30, 2014, the claimant was capable of light work activities with no concentrated exposure to extreme cold, noise, fumes/odors/dusts/gases, or hazards (See ex. 14F). The undersigned finds these opinions persuasive and accords them substantial weight because they are supported by the detailed and largely normal consultative exam findings, which are generally consistent with those documented in the treatment records during the period relevant to this decision, they are otherwise consistent with the medical evidence documenting numerous reports of good pain control and only a few indications of use of a cane, they are both based, at least in part, on review of some of the medical evidence of record, they are largely consistent with each other, and they are supported by the September 2011 work restrictions issued by a treating physician, Dr. Ghazi, indicating that the claimant could lift up to 20 pounds maximum, frequently lift 10 pounds, bend/stoop and climb for one hour a day each, and do no crawling (See ex. 3F at 17). However, the undersigned does not accord Dr. Ghazi's work restrictions controlling weight and gives them slightly less weight than the opinions of Dr. Mars and the Social Security medical consultant because they are not fully consistent with the objective medical findings, which were largely normal during the period relevant to this decision and support the existence of somewhat greater capacity for bending/stooping and climbing.

[AR 30]

The ALJ refers to a medical record dated September 23, 2011, by Dr. Ghazi, the worker's

compensation doctor treating Plaintiff at that time, who imposed the following work restrictions: "I will modify the patient's work restrictions to light or sedentary category of work. His maximum lift is now 20 pounds based on the valid FCE that was completed. I will allow a frequent l[i]ft of 10 pounds, which I think is both reasonable and appropriate. I will also limit bending and stooping to 1 hour per day and no crawling. The patient may climb for 1 hour per day total." [AR 334] Similarly, the ALJ found Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, and he was limited to no crawling. [AR 25] Apparently, the Plaintiff challenges the "difference" between Dr. Ghazi's limitations of bending, climbing, and stooping to one hour per day and the ALJ's limitations of "occasionally" stooping, kneeling, and crouching, and no climbing ladders or scaffolds. However, the Court finds no significant difference between the two.

First, within the Social Security disability context, "occasionally" means "from little to up to one third of the day, generally totaling less than two hours in an eight hour work day." *See* Social Security Ruling 96-6p, 1996 WL 374185, at *3 (SSA 1996). The Honorable Robert E. Blackburn from this District has determined that a requirement to crouch and stoop no more than one hour per day is consistent with a limitation on those activities to "occasionally." *Rosado v. Astrue*, No. 07-cv-01758-REB, 2008 WL 2999300, at *4 (D. Colo. Aug. 1, 2008). The Court agrees.

Second, the ALJ properly notes that he declines to accord Dr. Ghazi's opinion controlling weight and his reasons for doing so and for according the opinion "slightly less" than substantial weight are supported by the record. The Plaintiff does not convince the Court otherwise.

Therefore, the Court finds the ALJ did not err in finding Plaintiff "could perform light work" based on his legally supported analysis of the medical evidence in this case.

## **CONCLUSION**

In sum, the Court concludes that, while the ALJ did not fail to properly weigh the medical opinions concerning Plaintiff's physical impairments, he failed to consider Plaintiff's medically determinable mental impairment of ADD/ADHD in his analysis subsequent to Step Two and, thus, the Court cannot discern whether the ALJ properly formulated the RFC in this case. Accordingly, the decision of the ALJ that Plaintiff Mark Ronald Troe was not disabled since March 1, 2011 is AFFIRMED IN PART as to Plaintiff's physical impairments, REVERSED IN PART as to Plaintiff's mental impairments, AND REMANDED to the Commissioner for further consideration in accordance with this order.

Dated at Denver, Colorado this 30th day of May, 2017.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge